[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
A. FACTS
The plaintiff in this case is a Connecticut corporation located in Farmington, Connecticut and engaged in the business of investment banking, including the securing of funds for the acquisition of businesses and companies. The defendants, Richard J. Klingaman and R. Woodman Harris, both hereinafter referred to by their last names, are Connecticut residents who at all times pertinent hereto were actively engaged in an attempt to purchase the assets of a Maine corporation known as Stinson Canning Company, hereinafter referred to as Stinson. The defendants had engaged the services of a consulting and advisory company known as Touche Ross and Company, hereinafter referred to as Touche Ross. Stinson, of Prospect Harbor, Maine, was a family run business which engaged in the canning of sardines CT Page 8062 and fish steaks and operated five canning factories in coastal Maine. Its assets consisted of land, buildings, machinery, equipment, including fishing boats and unloading facilities, finished goods consisting of canned sardines and fish steaks, raw materials and intangible assets, such as brand names, accounts receivable, etc. The estimated acquisition price was approximately $24 million. The defendants were put in touch with Parker Benjamin through representatives of Touche Ross.
On or about July 25, 1989 the plaintiff, acting through Thomas A. D'Avanzo, its managing director, FAXED to the defendants a proposed contract fashioned along the lines discussed at a conference with them held earlier that day. The proposed contract stated, inter alia, that no fee would be due Parker Benjamin on account of any funds provided by Chemical Bank, Linc, Citicorp or Glenfed, potential sources of funding already contacted by defendants, unless offers were made by one of them to match or exceed an offer arranged by Parker Benjamin. Upon receipt of this draft, Mr. Harris told D'Avanzo that there were several sources which the defendants wanted to add to the excluded list and suggested that they include a Schedule A for this purpose. He also wanted a commitment to fund the entire transaction by August 15, 1989. The proposed contract was then revised by D'Avanzo; this time making reference to a Schedule A, even though he had not yet seen the expanded list of excluded sources, and adding the date of August 15, 1989. Harris and Klingaman signed the proposed contract on July 27, 1989 and FAXED it to D'Avanzo. Harris included a handwritten Schedule A on the FAX cover sheet. This included the names of 14 business entities with which the defendants had conducted negotiations for funding. The second item in the second of three columns was "Bank Boston." Two spaces below Bank Boston there appeared in parentheses "Casco Bank" with an arrow pointing up to Bank Boston past N.P. Carey, which was the item in between. D'Avanzo requested that Harris send a typewritten Schedule A and Harris complied, sending a four-page document which was a copy of the contract signed by himself and Klingaman with a typewritten Schedule A, together with a typewritten sheet labeled, "Parties Contacted by Touche Ross, Linc and Harris and Klingaman." The typed Schedule A consisted of two columns containing 13 items on separate lines. The third item in the first column was labeled "Bank Boston (Casco Bank)". The second attachment labeled "Parties Contacted -" contained 15 different business entities which had been previously contacted by the defendants but were not to be excluded sources and was provided to the plaintiff for informational purposes. The parties agree that this page is not part of the contract. CT Page 8063
It is the opinion of this court that the contract dated July 27, containing the typewritten Schedule A, is the final contract between the parties since it is the final product and the only one to have the approval of D'Avanzo, as well as the defendants. This is Exhibit 16. The contract provides that Parker Benjamin will advise the defendants on the data needed to obtain funding, prepare a financing memorandum, structure and present a proposal to various lenders and investors and negotiate terms with respect to the acquisition and financing of the Stinson Canning Company. Under this contract the plaintiff undertook to consider and pursue various financing structures to accomplish the acquisition including sale/leasebacks on real estate and/or equipment and mezzanine capital. The contract further provided that time is of the essence and the plaintiff agreed to give the assignment priority status. The plaintiff was given an exclusive right to arrange financing for this acquisition and the defendants agreed not to deal independently of the plaintiff while engaged except with respect to those sources noted in Schedule A.
The contract provided for a $10,000 retainer and a transaction fee equal to one percent of the debt financing arranged, one and a half percent of the purchase price of a sale/leaseback, and five percent of any mezzanine-equity funding component. The retainer was payable $5,000 upon being engaged and $5,000 upon receipt of an acceptable funding proposal. Although there was some delay in the payment of the second $5,000 the entire retainer has now been paid and is no longer an item of controversy in this case. The contract provided that the transaction fee was payable at closing. The defendants were given the right to accept or reject any or all proposals. Another provision provided that no fee would be due on those funds provided by the sources specified in Schedule A unless offers were made by them to match or exceed an offer arranged by the plaintiff.
The defendants retained the right to terminate the entire contract after 90 days and the termination would be effective 10 days after receipt of a written notice by the plaintiff. The exclusivity feature of the contract could be terminated by receipt of written notice if Parker Benjamin did not produce a commitment letter of funding acceptable to Harris and Klingaman on or before August 15, 1989. If no notice was given, the engagement was to terminate automatically upon completion of the transaction, that is the acquisition, or one year from the date of the contract, which was July 27, 1989. The contract provided further that notwithstanding the termination of the agreement, the CT Page 8064 plaintiff was entitled for two years after termination to be fully compensated under the terms of the agreement if a funding commitment was obtained from any source contacted by either party during the exclusive period, except with reference to Schedule A items. Another provision provided for monthly interest of one and one-half percent on any fee not paid when due.
It is clear from the evidence that Parker Benjamin immediately committed itself to the project, with Mr. D'Avanzo spending in excess of 80% of his time thereon and Mr. House, an employee, spending approximately 100% of his time during the period of their engagement. Parker Benjamin produced a "Confidential Planning Memorandum Stinson Canning Company" and although it used some material furnished by Touche Ross which had produced a financing proposal, this planning memorandum provided an extensive analysis and presentation of Stinson and various proposed financing structures to acquire same. Parker Benjamin sent financing memoranda to 23 prospective sources within a few days of its preparation. Parker Benjamin delivered a total of 10 proposals to the defendants. Among them were a proposal from Marine Midland Business Credit and one from Allied Financial Corporation. The Allied proposal was revised twice to reflect modifications requested by defendants. Later, proposals were received from AMEV and Tyler Glenn.
On September 13, 1989 the defendants terminated the exclusivity provision of the contract with Parker Benjamin by means of a letter FAXED to the plaintiff. As of that date the plaintiff had not produced a commitment letter of funding acceptable to Harris and Klingaman, although a number of proposals, as mentioned above, had been sent to the defendants and Tyler Glenn had submitted a proposal dated September 6, 1989 for a $3 million sale leaseback of equipment which was later accepted by the defendants. In the letter of termination of the exclusivity the defendant stated, "We will continue to work with you to get this deal done, but will not adjust the exclusions listed in Schedule A of our July 27th agreement." Despite the termination of the exclusivity portion of the contract by defendants, the plaintiff continued to work diligently and conscientiously on behalf of the defendants and D'Avanzo did get permission from them to approach a Schedule A source, W. P. Carey, for a proposal.
At some time prior to November 27, 1989 financing for the purchase of Stinson Canning Company was in place. The closing took place on or before January 5, 1990 and was financed as follows: CT Page 8065
 FUNDING SOURCES USED TO ACQUIRE ASSETS OF STINSON CANNING COMPANY January 05, 1990
CHEMICAL BANK
 Revolving Credit Facility $11,500,000 (face amount)
Term Loan $6,500,000
BANCBOSTON VENTURES
 Subordinated Loan $2,000,000 Warrants/Equity $1,500,000
FSIC
 Investors Equity $500,000 Shawmut Loan $2,000,000
STINSON SEAFOOD INC.
(100% owned Klingaman Harris $190,000
KLINGAMAN HARRIS $10,000
TOTAL $24,200,000
On or about November 27, 1989 the plaintiffs billed the defendants in anticipation of the closing. At this juncture the plaintiff claimed a fee of $171,000 arrived at as follows:
 $15,000 1 1/2% of $1 million purchase price for sale/leaseback on machinery, and Bath facility by FSIC (due at closing)
 $75,000 5% of $1.5 million on limited partnership equity capital contribution in Stinson Seafood Limited Partnership (due at closing)
$81,000 1 1/2% of $5.4 million CT Page 8066 purchase price for sale/leaseback on certain equipment (excluding Bath facility) by Dana Commercial Credit Corporation (via Tyler Glenn Company (due at closing).
(There was additional billing for the balance of the retainer which has now been paid and for a small sum for reimbursement which apparently has also been paid since it is no longer claimed by the plaintiff.)
On December 6, 1989, the defendants notified the plaintiff that the fees which they had billed would not in fact be earned at the Stinson closing, explaining that in their view the FSIC financing did not come within the terms of the July 27th agreement but indicating that there might still be room for financing by Yancey Brame and Dana Credit and stating that in the event either of these investors actually invest they, the defendants, would be happy to pay a fee based upon the July 27th agreement. In the last paragraph of this letter the defendants gave notice to the plaintiff of termination of the July 27th agreement.
The closing took place on or about January 5, 1990 and the defendants thereby acquired certain assets of Stinson Canning Company for approximately $21.3 million. Despite the claims of the plaintiff, the defendants have denied any liability for any portion of the transaction fee under the agreement of July 27, 1989. On January 25, 1990 the plaintiff made demand on the defendants for payment of the balance of its investment banking fee in accordance with its contractual letter of engagement dated July 27, 1989. The defendants have refused to pay said fees and on May 2, 1990 the plaintiff brought this action against the defendants.
The plaintiff's complaint was amended on September 13, 1990 and in that amended complaint containing one count the plaintiff claims that the defendants breached the contract of July 27, 1989 in one or more of the following ways:
 A. That they failed to pay the plaintiff the fees due and owing as set forth below.
 B. That the defendants breached their covenant of good faith and fair dealing, and
C. That the defendants dealt independently of the CT Page 8067 plaintiff while they were exclusively engaged.
The plaintiff claims that it faithfully complied with its obligations under the contract and demands $423,270 in fees plus 1.5% monthly interest on same. Said fees are arrived at as follows per the amended complaint:
 a) $93,270 for the Dana Commercial Credit Corporation sale/leaseback commitment in accordance with the provision that entitles Plaintiff ". . . to be fully compensated under the terms of this agreement if a funding commitment is obtained from any source contacted by either party during the exclusive period . . ."
 b) Fifteen thousand dollars ($15,000.00) for the FSIC sale/leaseback financing in accordance with the provision that entitles Plaintiff ". . . to be fully compensated under the terms of this agreement if a funding commitment is obtained from any source contacted by either party during the exclusive period . . ."
 c) Seventy-five thousand dollars ($75,000.00) for the FSIC equity financing, in accordance with the provision that entitles Plaintiff ". . . to be fully compensated under the terms of this agreement, if a funding commitment is obtained from any source contacted by either party during the exclusive period . . ."
 d) One hundred and seventy-five thousand dollars ($175,000.00) for the BancBoston Ventures mezzanine/equity capital, in accordance with the provision that entitles Plaintiff ". . . to be fully compensated under the terms of this agreement if a funding commitment is obtained from any source contacted by either party during the exclusive period . . ."
 e) Sixty-five thousand dollars ($65,000.00) for the Chemical Bank debt financing. Although Chemical Bank was listed on Schedule A, Plaintiff is entitled to its fee on this financing as Defendants did not deal independently with Chemical Bank, but used information provided by Plaintiff concerning financing it had arranged through two (2) other sources (Marine Midland and Dana Commercial Credit Corp. ) to obtain the most CT Page 8068 favorable terms possible with Chemical Bank which terms exceeded the offers arranged by Plaintiff. The July 25, 1989 contract specifically states that: "No fee will be due on those funds provided by the sources specified in Schedule A unless offers are made by them to match or exceed an offer arranged by us."
 f) Plaintiff is owed eighty dollars and thirty-four cents ($80.34) as reimbursement for out-of-state travel expenses as provided for in the engagement contract.
B. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.
Although the court agrees with the plaintiff that, "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement" quoting from 2 Restatement (Second) Contracts, section 205 (1981); Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 556 (1984), the court having heard the parties, read all the briefs submitted by the parties, examined and re-examined all of the evidence submitted and portions of the transcript of the trial, is of the opinion that there is insufficient credible evidence to substantiate a breach of an implied covenant of good faith and fair dealing in this case. The plaintiff alleges that the defendants acted in bad faith from the very inception of the contract, citing as an example the insistence that the contract contain an August 15, 1989 deadline which, it claims, was unreasonable in light of the defendants' failure to obtain funding during the prior five to six months. This the plaintiff maintains provided the defendants a "putative justification for terminating the exclusivity or the entire contract."
Considering the background, qualifications and experience of the principals on both sides of this case and keeping in mind that the contract was drafted by the plaintiff, whose managing director was aware of the history of negotiations, and considering that time was of the essence in this contract, the claim of the plaintiff in this regard is, to say the least, strained. The defendants had the right to terminate the exclusivity provision of the contract if a funding commitment was not produced on or before August 15, 1989, yet they did not terminate the exclusive provision until September 13 and although they could have terminated the entire contract on October 27th, they did not do so until December 6. As a further example of this lack of good faith theory, the plaintiff cites the fact CT Page 8069 that the defendants did not tell financial sources like Chemical or BancBoston Ventures about Parker Benjamin's participation, even though, plaintiff alleges, it would have enhanced the Stinson acquisition if potential financial sources knew that a professional investment banker was working with the defendants. However, there was nothing in the contract which placed any duty on the defendants to name Parker Benjamin and it is only a matter of speculation or opinion as to whether naming Parker Benjamin would have enhanced the Stinson acquisition.
As to the allegation that the defendants did not pursue or follow through with the Marine Midland proposal of August 9th and in so doing failed to show good faith, the evidence indicates that the defendants responded on August 11th and advised the plaintiffs that this proposal was not nearly so favorable to the defendants as Chemical's revolver taken together with Glenfed's term loan. There was at that time a $4 million difference in borrowing availability under the Chemical revolver formula versus the Marine Midland revolver formula. Under the contract the defendants had the right to accept or reject any or all of the plaintiff's proposal. Marine Midland came back with a revised proposal on August 24 and the defendants met with Marine Midland on August 29th.
The facts indicate, in short, that the defendants paid the plaintiff its retainer, paid travel expenses, paid good faith deposits to various people, tracked down every proposal, paid for computer financial models, took time out from negotiations with the seller, Stinson, to travel at their own expense to Washington D.C., New York, Boston and even San Francisco to meet and negotiate with the plaintiff's sources. They met with every funding source from which plaintiff produced a proposal. They even went further and permitted Parker Benjamin to negotiate a new proposal from W. P. Carey in September.
C. BANCBOSTON VENTURES
The plaintiff claims a fee of $175,000 based upon five percent of the $3,500,000 mezzanine/equity capital funding obtained from BancBoston Ventures. This claim is made under that provision of the contract of July 27, 1989 which provides that notwithstanding the termination of the agreement, Parker Benjamin is entitled for two years after termination to be fully compensated under the terms of the agreement if a funding commitment is obtained from any source contacted by either party during the exclusive period except those sources noted on Schedule A. CT Page 8070
There is no doubt that BancBoston Ventures was contacted by the defendants during the exclusive period of the contract and BancBoston Ventures ultimately issued a commitment for $3.5 million mezzanine financing. The plaintiff alleges that BancBoston Ventures is not an excluded source under Schedule A of the contract since it is not listed separately on Schedule A, whereas the defendants disagree, alleging that the listing of Bank Boston includes all of its subsidiaries. The plaintiff counters that only the Casco Bank subsidiary is excluded. The resolution of this question is dependent solely upon the correct interpretation of the contract of July 27, 1989. It is the opinion of this court, as stated above, that the final contract between the parties was that which contained the typewritten Schedule A. The plaintiff, through its managing director, agreed, albeit reluctantly, that the businesses included on the handwritten Schedule A were to be excluded. The contract had been drafted by D'Avanzo, signed by Klingaman and Harris two days later, and returned to D'Avanzo with a handwritten Schedule A attached. It was received by D'Avanzo who did not ask for any changes in substance but simply asked that Schedule A be typed. The fact that somebody, be it the typist or Harris, had rearranged the location on Schedule A of Casco Bank did not amount to any change in terms in the contract. Neither party intended that there be any change in the contract by having Schedule A typed.
It is the opinion of this court that BancBoston Ventures is an excluded source under Schedule A of the contract and that no fee is payable to the plaintiff based upon funding procured from that source. The contract is clear and unambiguous with respect to the exclusion of any financing procured from Bank Boston. To one not familiar with the financial world, some question might arise as to what is meant by including Casco Bank in parentheses next to Bank Boston. In this sense the contract is unclear and contains some ambiguity and, if any doubt remains, one can look to parol evidence of prior conversations and negotiations to explain this ambiguity. Jay Realty, Inc. v. Ahearn Development Corp., 189 Conn. 52, 56 (1983). The evidence is clear that all parties were aware of the fact that the defendants had been dealing with two subsidiaries of Bank Boston, i.e., BancBoston Capital and BancBoston Financial, prior to their engagement of Parker Benjamin and were currently engaged in negotiations with another subsidiary of Bank Boston but one which, however, did not contain the name Bank Boston in its name. This was Casco Bank. It seems clear to this court that placing CT Page 8071 Casco Bank in parentheses next to Bank Boston simply meant that it was to be excluded as well as any other subsidiary of Bank Boston. The location of and inclusion of Bank Boston and Casco Bank on the handwritten Schedule A; the course of the parties' performance; the fact that it was well-known to all parties that the Bank Boston subsidiaries mentioned above had already been dealt with and that they were omitted from the second schedule attached to the contract, that is, the schedule of "Parties Contacted by Touche Ross, Linc, and Harris and Klingaman" indicating that they were included with Bank Boston; and the fact that D'Avanzo sought permission from the defendants to contact the fourth subsidiary of Bank Boston, i.e., BancBoston Ventures prior to the final commitment all lead to the conclusion that all Bank Boston subsidiaries were meant to and understood to be excluded sources.
D. CHEMICAL BANK
The plaintiff claims a commission of $65,000 based upon the $6.5 million Chemical Bank term loan. While there is no question that Chemical Bank was included in Schedule A, the plaintiff makes its claim based upon that clause in the contract which states "No fee will be due on those funds provided by the sources specified in Schedule A unless offers are made by them to match or exceed an offer arranged by us." In short, the plaintiff claims that the offer made by Chemical Bank in committing itself to the $6.5 million term loan exceeded an offer made by Marine Midland which had been negotiated primarily by Parker Benjamin.
It is the opinion of this court that there is insufficient credible evidence to substantiate the plaintiff's claim by a fair preponderance of the evidence. In fact, there is virtually no evidence beyond the speculation of plaintiff in this regard. Whether the term "offer" as appears in the contract is the same as a "proposal" or a "commitment" is of no consequence in the determination of this issue. Accepting, however, the plaintiff's version, i.e., that offer equals proposal, an analysis of the facts leads inevitably to the conclusion that the second proposal made by Marine Midland, i.e., the proposal of August 23, 1989, exceeded the proposal and commitment made by Chemical Bank. Marine Midland's proposal of August 23rd called for an $8.9 million term loan, a $12 million revolver, and a $.9 million overadvance, i.e., $900,000 overadvance, for a total of $21.8 million. Chemical Bank on July 28, 1989 had made a commitment for a $12 million revolver. On September 14 Chemical Bank committed itself to a $6.5 million term loan in addition to the revolver. The CT Page 8072 basis of the plaintiff's claim is that although the Marine Midland proposal in fact exceeded the Chemical Bank commitments insofar as dollars available for credit were concerned, the Chemical Bank commitments exceeded the Marine Midland proposals because Chemical's could be committed to and could close sooner than Marine Midland's, and that this was due to improper use of the Marine Midland proposals to leverage an improved deal from Chemical Bank. There is no evidence whatsoever of any such improper use of Marine Midland's proposal. Chemical Bank was never made aware of the connection between the defendants and the plaintiff in this case. When Glenfed and LINC/Citicorp failed to produce anticipated commitments for a term loan or a sale/leaseback, the defendants reverted to Chemical Bank to review the appraisals which had been furnished to them (as well as to all others considering financing of the fixed assets of Stinson) and to issue a commitment for a fixed asset term loan such as had been discussed in prior negotiations. The facts are that Chemical had been involved in the overall acquisition since May; had already done its "due diligence" and visited the facilities; tested the inventory and the financial records, etc.; gone through credit committee and issued the first commitment in July of 1989; all of this before Marine Midland had ever heard of Stinson Canning Company.
The Marine Midland proposal in fact exceeded that of the Chemical Bank measured in dollars which is the essence of the transaction. The contract gave the defendants the right to accept or reject any proposal. There is no credible evidence that the defendants acted in bad faith in rejecting Marine Midland but only evidence that they exercised what in their opinion was sound business judgment for business reasons. The defendants were approaching a deadline of September 30, 1989 set by the sellers. The contract made clear that time was of the essence and the defendants had the ability to present to the sellers commitments within the time limit which they had set.
E. FIRST SEAFOOD INVESTORS CORP., INC.
The acquisition of Stinson was accomplished finally with, among other sources, a total of $2.5 million of financing furnished by First Seafood Investors hereinafter FSIC. One million of this sum was accomplished by means of a sale/leaseback arrangement on the machinery and $1.5 million was loaned by FSIC as equity capital. FSIC procured its funds from a $500,000 syndication of individual investors and $2 million loaned by Shawmut Bank. The plaintiff claims that First Seafood Investors Corporation was a syndication of CT Page 8073 investors formed during the exclusive period of the contract and, therefore, it is entitled to fees of $15,000 on the sale/leaseback and $75,000 on the equity financing, for a total of $90,000 in fees based upon the FSIC transaction. Shawmut Bank is admittedly a source which appears on Schedule A. It is clear that no monies loaned by Shawmut went directly toward the acquisition of Stinson. These monies went to a separate legal entity which then used its assets to invest in the acquisition of Stinson. Under the terms of the contract Parker Benjamin is to be fully compensated under the terms of the agreement if a funding commitment is obtained from any source contacted by either party during the exclusive period except a source listed on Schedule A. The other parties to the contract are Klingaman and Harris and although they participated or were instrumental in obtaining a commitment from Shawmut to FSIC it is clear that within the terms of the contract they did not receive a funding commitment from Shawmut. They did receive a funding commitment from FSIC, a separate legal entity, involving a number of different people who collectively, under the mantle of a corporate structure, assumed all of the terms and obligations of a loan of $2 million from Shawmut Bank and investments of $500.00 from several individuals. The evidence indicates that the defendants did in fact deal with Shawmut Bank and were basically responsible for Shawmut's proposal to Harris dated September 5, 1989. This proposal was transmitted in substance on September 18, 1989 to Christian Rice, Vice President of Touche Ross and Company, naming Bath Limited Partnership as the borrower and again in substance was transmitted by Shawmut to Mr. Joseph Murphy, President, First Seafood Investors Corporation, under date of November 2, 1989, this time naming the borrower as First Seafood Investors Corporation and taking the form of a commitment. The defendants take the view that one should look through form to substance and that the true source of the funds was Shawmut Bank, an excluded source. The defendants maintain that FSIC was not a separate funding source but became a mere conduit or channel for the Shawmut $2 million loan and the $500 in investor equity. In the defendants' view the only business purpose of FSIC was to participate in the Stinson acquisition by funding the Bath sales/leaseback. If, of course, the court should adopt the view of the defendants, the result would be that Shawmut was the source of the $2.5 million financing in question and that it was an excluded source. Although, as will be seen, the result is the same, the court feels that a correct technical analysis of the problem is that put forth by the plaintiff — that the separate entity, the corporation known as FSIC, was in fact the source of funds used in the acquisition. The reason CT Page 8074 being that FSIC was at that stage a completely separate legal entity consisting of approximately 15 investors, albeit two of them were the defendants, and this corporation became legally liable for the debt to Shawmut.
The next question to be resolved is, of course, whether or not FSIC was a source contacted by either party within the exclusive period of the contract. The answer is in the negative. FSIC was not incorporated until November 1, 1989. While the plaintiff rejects Shawmut Bank as the source of the $2.5 million in question and relies on the separate legal entity of the FSIC it now uses the opposite argument to maintain that FSIC was contacted during the exclusive period and it maintains that, except for the organizational structure which changed from a limited partnership to a corporation the entity to which Shawmut proposed to loan $2 million on September 5, 1989 was the same entity as FSIC to which it submitted another revised commitment on November 2, the day after FSIC was incorporated. Various other incidents cited by the plaintiff to substantiate its position, such as the concept of individual investors being recognized by the defendants in a letter of October 13, 1989 (the letter questioning payment of the second half of the retainer); the fact that Rice, a paid agent of the defendants, was trying to put together sale/leaseback funding in a letter to Brame; a memo from Ryan to the Stinson owners and the Shawmut commitment to Touche Ross partners, all amount to nothing more than solicitations of individuals and other companies, none of which matured into commitments. The large majority of the 15 investors in FSIC were never contacted until long after the exclusive period had run out. Based on the foregoing, it is the opinion of this court that the plaintiffs are not entitled to a commission from the $2.5 million funding furnished by FSIC.
F. DANA COMMERCIAL CREDIT CORPORATION
The defendants claim a fee of $93,270 based upon a funding commitment from Dana Commercial Credit Corporation arranged through Tyler Glenn Company. This was the second of two such proposals submitted by Dana Commercial Credit Corporation accepted by the defendants. The first was dated November 14, 1989 and the second dated January 25, 1990. The defendants have acknowledged in testimony and in argument that the plaintiff contacted Tyler Glenn Company during the exclusive period and introduced this funding source to the defendants. Tyler Glenn was contacted because it is an "intermediary" which arranges equipment lease financing for large investors. Tyler Glenn issued a proposal dated September 6, 1989 to Thomas D'Avanzo for CT Page 8075 a $3 million sale/leaseback of machinery and equipment located at the Stinson plant in Bath, Maine. Harris accepted this proposal on September 7. In this proposal the lessor is "Tyler Glenn LBO leasing syndicate or its assigns," at that time a group of investors including Dana Commercial Credit Company. This proposal was revised on September 22 in a letter directed to Klingaman which increased the proposal to a $6.5 million sale/leaseback. This was accepted by the defendants on September 28 with a few minor changes which were handwritten on the proposal. On November 14, 1989 Dana Commercial Credit submitted a commitment for $5.4 million which commitment referred to and incorporated a proposal previously submitted by Tyler Glenn on behalf of Dana Commercial Credit. Subsequently Tyler Glenn increased the Dana Commercial Credit commitment to $6.218 million. This commitment stated that it updates Tyler Glenn's proposal of September 22 as amended by Dana Commercial Credit Corporation's commitment letter. On January 25, 1990 Tyler Glenn issued a further commitment referring to the Dana Commercial Credit Corporation commitment and containing certain changes agreed upon between the defendants and Dana Commercial Credit.
The defendants object to the claim on the grounds that the Dana commitment could not be closed and never did close to produce funding; that the transaction fee or commission was only due at closing and that this commitment never closed; and further, that Dana was not a source contacted by defendants or by plaintiff during the exclusive period since most of the dealing was done through Tyler Glenn.
Plaintiff argues that the contract does not require that funds be obtained but, rather, that a funding commitment be obtained, and that the term obtained does not mean closed.
The difficulty comes in that there is no definition of the term "funding commitment" and the evidence indicates that funding commitment can be used in many different ways. An examination of Exhibits 7, 8, 9, 11, 12 and 17, for example, indicates that sometimes the word commitment has no more meaning or effect than the word proposal, whereas other times apparently it can be the basis of a binding contract. In no case, however, is it used synonymously with closing or any other finalization of a transaction. The defendants point to the compensation section of the contract, paragraph three, and particularly to that portion which says the transaction fee is payable at closing. The contract, however, does not say that a fee is earned when a sale is finalized or closed. The transaction fee is based upon financing "arranged" and it refers to the transaction fee being payable at closing CT Page 8076 not earned at closing. There would be no meaning to the last sentence of paragraph three if the only way that the plaintiff could collect a fee would be if a funding commitment or offer were dependent upon closing. Since the defendants have the right to accept or reject any proposals obtained by the plaintiff, the section of the contract in question would appear to be an incentive to have the plaintiff continue to pursue leads, either those rejected or new leads, until a commitment has been obtained.
It is the opinion of this court that a funding commitment of $6.218 million was obtained by the defendants from Dana Commercial Credit acting through Tyler Glenn and that this was a source contacted by the plaintiff within the exclusive period.
The plaintiffs are entitled to a fee of $93,270 plus interest at the rate of one and one-half percent per month from the date of closing.
Judgment may enter in accordance with this Memorandum of Decision.
HALE, ROBERT J. TRIAL REFEREE